**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

**CHARLES WALTER SMITH, III**
    **Plaintiff,**

v.

**JAMES KENNEDY, M.D.; and
SAFEWAY INC.**

    **Defendants**

---

### COMPLAINT AND JURY DEMAND

---

Comes now, Plaintiff Charles Smith, by and through his attorneys, David S. Woodruff and Gennevieve St. Leger of the law firm Hillyard, Wahlberg, Kudla, Sloane & Woodruff, LLP, respectfully submits his Complaint, and demands a jury trial of the following claims for relief and states, avers, and alleges as follows:

### I.  PARTIES

1. Plaintiff Charles Smith was a resident of Grand County, Colorado residing at 303 Doc Susie Ave., Fraser, CO 80442, when the events giving rise to the action occurred. However, Plaintiff is currently domiciled in Wright City, Missouri.

2. At all times material hereto, Defendant James Kennedy, M.D. was and is a physician licensed to practice medicine in the State of Colorado, practicing medicine in Colorado and holding himself out as having specialized knowledge and skill in the field of Family Medicine. At all times material hereto, Defendant Kennedy was and is the principal owner of Byers Peak

Family Medicine, L.L.C., with its principal medical offices located at 78878 US Highway 40, Winter Park, CO 80482.

3. At all times material hereto, Defendant Safeway Inc. ("Defendant Safeway") was and is a Delaware corporation, with its principal office located at 5918 Stoneridge Mall Rd., Pleasanton, CA 94588, and operating as a pharmacy licensed by the State of Colorado to provide pharmacy services at the location known as Safeway Pharmacy, 40 Co Rd., Fraser, CO 80442.

## II.     JURISDICTION

4. Plaintiff brings his complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

## III. FACTUAL ALLEGATIONS

5. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

6. At all times relevant to the claims asserted herein, Defendant Kennedy was and is the owner and principal operator of a medical practice known publicly and advertised as "Byers Peak Family Medicine, L.L.C," located at 78878 US Highway 40, Winter Park, CO 80482.

### A.     Charles Smith's Presentation to Defendant Kennedy

7. On or about July 30, 2013, Charles Smith became a new patient at Byers Peak Family Medicine.

8. On or about July 30, 2013 Plaintiff presented to Defendant Kennedy at Byers Peak Family Medicine for evaluation of sleep disturbances and anxiety.

9. Defendant Kennedy concluded that Plaintiff had a possible diagnosis of bipolar disorder.

10. Bipolar Disorder is a complex DSM-IV psychological diagnoses that requires a formal, detailed psychiatric assessment for proper diagnosis and treatment.

11.     Defendant Kennedy did not conduct a formal detailed psychiatric assessment of Plaintiff's emotional/mood disorder.

12.     Defendant Kennedy did not refer Plaintiff to a psychiatrist or psychologist to have a formal detailed psychiatric assessment of his emotional/mood disorder.

13.     Defendant Kennedy knew that Plaintiff had previously seen a psychiatrist.

14.     Defendant Kennedy did not communicate with any of Plaintiff's prior treating medical providers, or obtain prior medical records, or make any other reasonable effort to determine whether Plaintiff had ever been diagnosed with Bipolar Disorder.

15.     On the basis of Plaintiff's substance abuse history, and his symptoms of restlessness, apprehension, insomnia and frustration, Defendant Kennedy concluded Plaintiff suffered from Bipolar Disorder.

16.     Defendant Kennedy prescribed Plaintiff 100mg dose of Lamictal (lamotrigine) once a day for three days and then increasing to one 100mg dose twice a day.

17.     Defendant Kennedy did not explain to Plaintiff the nature of his medical condition and all of the available treatment options, the nature of lamotrigine and substantial risks associated with taking lamotrigine, or the alternatives to lamotrigine therapy and substantial risks associated with such alternatives.

18.     In prescribing Plaintiff Lamictal (lamotrigine), Defendant Kennedy did not inform Plaintiff that lamotrigine carried a substantial risk of severe injury with permanent sequelae and/or death.

B. **The Substantial Risk of Stevens-Johnson Syndrome and Erethema Multiforme (Toxic Epidermal Necrolysis) Associated With Ingestion of Lamotrigine**

19. "Lamictal" (lamotrigine) was originally developed, and approved by the United States Food & Drug Administation ("FDA"), as an antiepilectic drug for treatment of seizures associated with epilepsy and Lennox-Gastaut syndrome.

20. The FDA initially approved Lamictal for treatment of partial seizures in December 1994. In August 1998, the FDA approved Lamictal for use as adjunctive treatment of Lennox-Gastaut seizure syndrome in pediatric and adult patients, and in January 2003, the FDA approved Lamictal for use as adjunctive therapy for partial seizures in pediatric patients as young as two years of age. In June 2003, the FDA approved Lamictal for maintenance treatment of adult patients with Bipolar I disorder.

21. At all times material hereto, Lamictal and its generic form, Lamotrigine, were and are recognized and categorized by the FDA as prescription medications that pose a serious and significant public health concern, associated with serious risks (relative to benefits) of which patients should be made aware because information concerning the risk(s) could affect patients' decision to use, or to continue to use, these products.

22. According to the FDA and pharmaceutical manufacturer(s), lamotrigine carries a substantial risk of causing serious injury, including permanent sequelae, and/or death.

23. The risks and dangers associated with lamotrigine are significant enough that the FDA has mandated that all potential users of lamotrigine be provided a Medication Guide, upon which a mandatory "Black Box Warning" is to be prominently displayed. The Black Box Warning, and the Medication Guide and prescribing information for lamotrigine, caution that the medication is

known to cause "serious rash," including Stevens-Johnson syndrome/Toxic Epidermal Necrolysis (erythema multiforme), a severe and potentially fatal drug reaction.

24. Given the significant risks and dangers associated with ingestion of lamotrigine, it is to be prescribed only in patient populations in whom the drug's safety and effectiveness have been evaluated.

25. Additionally, given the significant risks and dangers associated with ingestion of lamotrigine, it is to be prescribed only where the demonstrated benefit significantly outweighs the known risk associated with the drug.

26. At all times material hereto, the FDA and manufacturer of lamotrigine strongly cautioned that a strict escalation regimen (titration) is mandatory, due to the dangers associated with lamotrigine.

27. The escalation regimen for adult patients with bipolar disorder is as follows:

   a. 25mg/daily for the first 2 weeks;

   b. 50 mg/daily for weeks 3-4;

   c. 100 mg/daily for week 5;

   d. Ultimately reaching a maximum dosage of 200 mg in adult patients after safe titration/escalation.

28. The manufacturer and FDA explicitly warn and instruct that "the recommended initial dose and subsequent dose escalations of lamotrigine should not be exceeded."

29. Accordingly, prescribing a starting dose of lamotrigine of 100 mg/ daily was and is a violation of the FDA and manufacturer escalation regimen schedule.

30. The dangers of lamotrigine are substantially increased if the initial dose recommended by the manufacturer is exceeded.

### C.     Defendant Safeway Pharmacy

31. After leaving Defendant Kennedy's clinic, Plaintiff presented to Safeway Pharmacy to fill the lamotrigine prescription written by Defendant Kennedy. In the past, Plaintiff had filled his prescriptions at Defendant Safeway Pharmacy. Defendant Safeway knew or had reason to know of Plaintiff's past medication history, including the fact that he had never before taken Lamictal/lamotrigine.

32. At all times material hereto, Defendant Safeway Pharmacy was and is an "authorized dispenser" (pharmacy) operating within the state of Colorado.

33. At all times material hereto, Defendants Safeway Pharmacy and its employees were required to abide by state and federal laws, rules and regulations with regard to dispensation of medications, including the medication dispensed to Plaintiff.

34. In filling Plaintiff's prescription, Defendant Safeway Pharmacy knew or should have known that this was a first-time prescription of lamotrigine for Charles Smith.

35. In filling Plaintiff's prescription, Defendant Safeway Pharmacy knew or should have known that the dispensed medication, lamotrigine, was associated with a significant risk of severe injury or death, including Stevens-Johnson syndrome and erythema multiforme (toxic epidermal necrolysis).

36. In filling Plaintiff's prescription, Defendant Safeway Pharmacy knew or should have known that the risk of severe injury or death from lamotrigine ingestion would be greatly

increased by the failure to comply with and adhere to manufacturer and FDA warnings and mandates regarding starting dose and escalation/titration regimen.

37. In filling Plaintiff's prescription, Defendant Safeway Pharmacy knew or should have known that the mandatory starting dose of lamotrigine for a first-time user such as Plaintiff was 25mg/day, and that an escalation/titration regimen was required as follows:

   a. 25mg/daily for the first 2 weeks;

   b. 50 mg/daily for weeks 3-4;

   c. 100 mg/daily for week 5;

   d. Ultimately reaching a maximum dosage of 200 mg in adult patients after safe titration/escalation.

38. Despite manufacturer and FDA warnings mandating this titration, Defendant Safeway Pharmacy filled the prescription written by Defendant Kennedy, providing Chuck Smith a starting dose of lamotrigine of 100 mg/daily increasing to 200 mg/daily after three days.

39. In filling the prescription, Defendant Safeway Pharmacy did not contact Defendant Kennedy to confirm or discuss the accuracy or appropriateness of the prescription.

40. In filling the prescription, Defendant Safeway Pharmacy did not discuss with Charles Smith the risks and dangers associated with lamotrigine, including the risk of severe injury or death from Stevens-Johnson Syndrome/Toxic Epidermal Necrolysis (erythema multiforme).

41. In filling the prescription, Defendant Safeway Pharmacy did not discuss with Plaintiff Charles Smith whether the medication and the prescribed dosage was safe and appropriate for him.

42. Plaintiff Charles Smith accepted the lamotrigine as prescribed by Defendant Kennedy and filled by Defendant Safeway Pharmacy, unaware that he had been dispensed a dose 8 times greater than the approved starting dose, and unaware that lamotrigine at that dose carried a significant risk of severe injury or death.

**Plaintiff Develops Stevens-Johnson Syndrome Due to a Lamotrigine Overdose**

43. Upon taking the Lamictal/lamotrigine as prescribed for approximately 3 weeks, Plaintiff developed symptoms including a diffuse rash, dizziness, fever, and fatigue.

44. On or about August 26, 2013, Plaintiff presented to Byers Peak and was seen by Defendant Kennedy. Upon examination Defendant Kennedy identified a diffuse coalescing rash over Mr. Smith's trunk, face, and extremities. Mr. Smith informed Defendant Kennedy that he had stopped taking the Lamictal.

45. Defendant Kennedy failed to recognize that Plaintiff was in the early stages of Stevens-Johnson syndrome. He instead diagnosed Mr. Smith with an "allergic skin reaction" and prescribed prednisone.

46. On or about August 29, 2013, Mr. Smith called Defendant Byers Peak and told Defendant Kennedy the rash had not improved and he was suffering a significant amount of pain. Defendant Kennedy prescribed Plaintiff Hydrocodone to help treat Plaintiff's pain symptoms.

47. The following day, August 30, 2013, Plaintiff presented again to Byers Peak Family Medicine. He was not seen by Defendant Kennedy, but was instead seen by another provider, Dr. Glancey, who noted Plaintiff to have a worsening rash despite prednisone treatment, and a temperature on 99.7 degrees Fahrenheit. Dr. Glancey prescribed doxycycline to treat Mr. Smith's rash and sent Mr. Smith home.

48.     The following day, August 31, 2013, Mr. Smith's rash continued to worsen and he presented to Middle Park Medical Center with rashes on his face, chest, back, arms and legs along with buccal lesions. Mr. Smith was discharged home from Middle Park Medical Center with 60mg prednisone, pain medication, and instructions to discontinue the doxycycline and to return for follow up.

49.     On September 2, 2013, Mr. Smith's symptoms continued to worsen. He returned to Middle Park Medical Center with a temperature over 102 degrees, swollen lymph nodes, and the rash had spread to cover his entire body including his lips. Mr. Smith had obvious erythema, urticaria, edema, and peeling to 90% of his skin surface. He also had dry eyes, a dry mouth with cracks and ulcerations to his lips and tongue.

50.     Mr. Smith was transferred from Middle Park Medical Center via ambulance to University Hospital Burn ICU in Aurora, Colorado.

51.     Mr. Smith was admitted to the burn unit at University Hospital. Plaintiff was diagnosed with Stevens Johnson Syndrome progressing to Toxic Epidermal Necrolysis. Lamictal was identified as the likely causative agent of Plaintiff's symptoms. Plaintiff remained admitted in the burn unit for approximately three weeks, where he underwent extensive medical care and treatment.

52.     As a result of his adverse drug reaction, hospitalization, and ongoing medical complications and treatment, Plaintiff Charles Smith has suffered economic and noneconomic damages and losses. He has suffered, and will continue to suffer for the remainder of his lifetime, severe and extensive medical complications stemming from his SJS/TEN, including, but not limited to:

    a.    Permanent damage to eyes;

    b.    Sensitivity and scarring to skin, including lesions;

    c.    Scarring and damage to mucous membranes including organs;

    d.    Damage to joints;

    e.    Chronic outbreaks of rashes, boils and other skin conditions;

    f.    Systemic Inflammatory Response Syndrome ("SIRS") resulting in hyperglycemia/diabetes;

    g.    Increased likelihood of/risk for clotting disorders;

    h.    Increased likelihood of/risk for renal failure; and

    i.    Decreased mucosal capacity.

## IV. FIRST CLAIM FOR RELIEF

### (Negligence - Defendant Kennedy)

53. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

54. At all times material hereto, with respect to the care and treatment provided to Plaintiff Charles Smith, Defendant Kennedy held himself out as a specialist in the field of family medicine.

55. At all times material hereto, Defendant Kennedy owed a duty to Plaintiff Charles Smith to exercise that degree of skill, care, caution, diligence, and foresight exercised and expected of other physicians practicing in the field of family medicine.

56. Defendant Kennedy defendant Kennedy breached that duty, and was negligent, by, including but not limited to, the following acts or failures to act:

    a.    Negligently failing to properly evaluate, diagnose, and treat Plaintiff's medical condition;

    b.    Negligently failing to ascertain or confirm the accuracy of a diagnosis in making treatment decisions;

    c.    Negligently making treatment decisions/recommendations;

    d.    Negligently failing to advise Plaintiff of the nature of his medical condition, the nature of and risks associated with the proposed treatment, and the alternative treatments available and the risks associated with those alternatives;

    e.    Negligently prescribing medication in a manner that was not appropriate for Plaintiff;

    f.    Negligently prescribing a starting medication dosage that created an unnecessary and substantial risk of severe injury and/or death; and

    g.    Negligently failing to provide proper follow up supervision and treatment.

57. As a direct and proximate result of Defendant Kennedy's negligence, Plaintiff Charles Smith has suffered injuries, damages, and losses including but not limited to pain, suffering, permanent physical impairment and disfigurement, loss of earnings/earning capacity, and past and future medical expenses.

## V. SECOND CLAIM FOR RELIEF –

### (Lack of Informed Consent – Defendant Kennedy)

58. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

59. At all times material hereto, Defendant Kennedy owed a duty to Plaintiff Charles Smith to exercise that degree of skill, care, caution, diligence, and foresight exercised and expected by

other health care providers practicing in a family medicine setting in obtaining Plaintiff's informed consent prior to providing medical care and treatment.

60. Defendant Kennedy defendant Kennedy breached that duty, and was negligent, by failing to obtain informed consent from Plaintiff, including but not limited to the following acts or omissions:

    a. Failing to inform Plaintiff of the nature of his medical condition;

    b. Failing to inform Plaintiff of the nature of the proposed medical treatment;

    c. Failing to inform Plaintiff of the alternative treatments available;

    d. Failing to inform Plaintiff of the substantial risks associated with the proposed treatment, and the substantial risks, if any, of the alternative treatments.

61. Defendant Kennedy knew or should have known that Lamictal/lamotrigine therapy was associated with severe side effects and adverse events, including Stevens Johnson syndrome/Toxic Epidermal Necrolysis.

62. Despite actual or constructive knowledge of the substantial risks associated with Lamictal/lamotrigine therapy, and despite having a duty to communicate such information to Plaintiff, Defendant Kennedy failed to advise Plaintiff of any such risk.

63. A reasonable person in the same or similar circumstances as Plaintiff would not have consented to receiving a 100mg starting dosage of lamotrigine increasing to 200mg/daily after three days if he/she had been given the information required for informed consent.

64. As a direct and proximate result of Defendant Kennedy's failure to properly obtain Plaintiff's informed consent, Plaintiff Charles Smith has suffered injuries, damages, and losses

including but not limited to pain, suffering, permanent physical impairment and disfigurement, loss of earnings/earning capacity, and past and future medical expenses.

## VI. THIRD CLAIM FOR RELIEF

### (Negligence – Defendant Safeway Pharmacy)

65. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

66. At all times material hereto, Defendant Safeway Pharmacy owed a duty to its customers, including Plaintiff Charles Smith, to use reasonable care in establishing policies, procedures, and systems for dispensing prescription medications to its customers, including Plaintiff.

67. The pharmacist and non-pharmacist employees of Defendant Safeway Pharmacy also owed a duty to customers, including Plaintiff Charles Smith, to use reasonable care in dispensing prescription medications.

68. In filling Defendant Kennedy's prescription and dispensing Lamictal/lamotrigine to Plaintiff, agents and employees of Defendant Safeway Pharmacy at all times acted in the course and scope of their employment with Defendant Safeway Pharmacy.

69. Defendant Safeway Pharmacy failed to use reasonable care, breached that duty, and was negligent, in establishing its policies, procedures and systems for dispensing potentially deadly medications such as Lamictal/lamotrigine.

70. Defendant Safeway Pharmacy, by and through its employees and/or agents failed to use reasonable care in dispensing lamotrigine to Plaintiff Charles Smith and breached that duty of care and was negligent, including but not limited to the following:

   a. Failing to use reasonable care in dispensing Lamictal and/or its generic form lamotrigine to Charles Smith;

    b.    Dispensing to Plaintiff a starting dose of Lamictal/lamotrigine that was *four times* the mandatory initial starting dose established by the FDA and manufacturer;

    c.    Filling a prescription for Plaintiff that after the third day of treatment would be *eight times* the mandatory initial starting dose established by the FDA and manufacturer.

    d.    Negligently failing to contact the prescribing physician to verify the accuracy and appropriateness of dispensing lamotrigine to Plaintiff Charles Smith;

    e.    Negligently failing to correct Defendant Kennedy's prescription;

    f.    Negligently dispensing a dangerous medication in a dose that was potentially lethal to a first-time user such as Plaintiff;

    g.    Negligently failing to ensure the safety of the Lamictal/Lamotrigine prescription filled for Plaintiff; and

    h.    Negligently failing to properly notify and inform Plaintiff Charles Smith regarding the risks associated with Lamictal/lamotrigine, including but not limited to potential side effects and adverse events, contraindications, and signs and symptoms of the known, recognized complications.

71.    As a direct and proximate result of the negligence of Defendants Safeway Pharmacy Plaintiff Charles Smith has suffered injuries, damages, and losses including but not limited to pain, suffering, permanent physical impairment and disfigurement, loss of earnings/earning capacity, and past and future medical expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in favor of Plaintiff and against the named defendants for general and special damages in an amount that will fully and fairly compensate Plaintiff for his injuries and damages, both past and future, prejudgment and post judgment interest as permitted by law, cost of this suit, expert witness fees, attorney fees, and for such other and further relief as this court may deem just and proper.

**PLAINTIFF REQUESTS A JURY TO HEAR ALL ISSUES IN THIS CASE**

**DATED:** Wednesday, July 29, 2015

Respectfully submitted,

HILLYARD, WAHLBERG, KUDLA, SLOANE
& WOODRUFF, LLP

*In accordance with C.R.C.P. 121 §1-26(9) a printed copy of this document with signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.*

 /s/David S. Woodruff_____
David S. Woodruff, #32585
Gennevieve St. Leger, #46495
HILLYARD, WAHLBERG, KUDLA, SLOANE
& WOODRUFF, LLP
4601 DTC Blvd. Suite 950
Denver, CO 80237
Telephone: 303-571-5302
FAX: 303-571-1806
Email: david@denvertriallawyers.com
         gen@denvertriallawyers.com

Attorneys for Plaintiff

Plaintiff's Address: 1140 Mac's Cove Drive, Wright City, MO, 63390